PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 13-4237

———

SERGEY ALEYNIKOV

v.

THE GOLDMAN SACHS GROUP, INC.,
                                        Appellant

———

On Appeal from United States District Court
for the District of New Jersey
(D. N.J. No. 2-12-cv-05994)
District Judge:  Honorable Kevin McNulty

———

Argued Tuesday, January 21, 2014

Before:  FUENTES and FISHER, *Circuit Judges*, and JONES II,[*] *District Judge*.


(Filed:  September 3, 2014 )



Karen A. Chesley, Esq.

Christopher E. Duffy, Esq. ARGUED
Boies, Schiller & Flexner
575 Lexington Avenue
7th Floor
New York, NY 10022


A. Ross Pearlson, Esq.
Wolff & Samson
One Boland Drive
The Offices at Crystal Lake
West Orange, NJ 07052


           Counsel for Appellant

---

[*]The Honorable C. Darnell Jones, II, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

John A. Boyle, Esq.

Kevin H. Marino, Esq. ARGUED

John D. Tortorella, Esq.
Marino, Tortorella & Boyle
437 Southern Boulevard
Chatham, NJ 07928

Counsel for Appellee

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

Appellee Sergey Aleynikov is a computer programmer who worked at Goldman, Sachs & Co. ("GSCo") from 2007 through 2009 and held the title of vice president. After accepting an employment offer from another company, Aleynikov copied source code developed at GSCo into computer files and transferred them out of GSCo. He was indicted by a federal grand jury and convicted of violations of the National Stolen Property Act, 18 U.S.C. § 2314, and the Economic Espionage Act, 18 U.S.C. § 1832. The United States Court of Appeals for the Second Circuit reversed his conviction, concluding that his conduct did not violate federal law. He was then indicted by a New York grand jury for violations of New York law and this criminal case remains

3

pending.

Aleynikov brought this suit in the United States District Court for the District of New Jersey seeking indemnification and advancement for his attorney's fees from Appellant the Goldman Sachs Group, Inc. ("GS Group," and together with GSCo, "Goldman"). He seeks indemnification for attorney's fees expended in defending against the federal criminal charges and advancement of attorney's fees for the state criminal charges, along with "fees on fees" incurred in obtaining indemnification and advancement. He claims his right to indemnification and advancement under a portion of GS Group's By-Laws that applies to non-corporate subsidiaries like GSCo, providing for indemnification and advancement to, among others, officers of GSCo. Following expedited discovery in aid of defining the term officer, the District Court granted summary judgment in Aleynikov's favor on his claim for advancement but denied it on his claim for indemnification and denied Goldman's cross-motion for summary judgment. Goldman appealed.

We are asked to interpret the meaning of the term officer in GS Group's By-Laws and determine whether Aleynikov is entitled to indemnification and advancement due to his title of vice president. We conclude that the term officer is ambiguous and that the relevant extrinsic evidence raises genuine issues of material fact precluding summary judgment. We therefore vacate the District Court's grant of summary judgment in Aleynikov's favor on the advancement issue. While we exercise supplemental appellate jurisdiction over the District Court's denial of Goldman's cross-motion for summary judgment, as urged by Goldman, we affirm the District Court's denial of summary judgment in Goldman's favor.

4

I.

A.

GS Group is a corporation organized under the laws of the state of Delaware. GSCo is a New York limited partnership and non-corporate subsidiary of GS Group. Section 6.4 of GS Group's By-Laws addresses indemnification for and advancement of legal fees and costs for, among others, officers of GS Group and officers of GS Group's corporate and non-corporate subsidiaries including GSCo. This Section provides that for non-corporate subsidiaries, "the term 'officer,' . . . shall include in addition to any officer of such entity, any person serving in a similar capacity or as the manager of such entity." App. 118.

As a limited partnership and non-corporate subsidiary of GS Group, GSCo is not required to have officers. GSCo has appointed officers pursuant to a written resolution process, but this process was not widely disseminated. It has no other formal appointment processes for officers. GSCo employs tens of thousands of employees. Approximately one-third of those employees hold the title of vice president. Someone with the title of vice president is more senior than someone with the title of analyst or associate, but less senior than someone with the title of managing director.

Aleynikov worked as a computer programmer for GSCo from May 7, 2007 until June 30, 2009, although his last day in the office was June 5, 2009. While at GSCo, he developed source code for Goldman's high-frequency trading system and held the title of vice president in GSCo's equities division. He did not supervise other employees or transact business on behalf of GSCo. He exercised no management or leadership responsibilities. As a part his employment,

5

Aleynikov agreed to keep all proprietary information belonging to GSCo confidential.

In late April 2009, Aleynikov accepted an employment offer from Teza Technologies, a startup company in the high-frequency trading business. On his last day in GSCo's offices, Aleynikov copied GSCo's source code into computer files and transferred those files to a server in Germany. On July 1, 2009, Goldman contacted federal law-enforcement authorities to report the transfer of the files. Two days later, FBI agents arrested Aleynikov.

Aleynikov was indicted by a federal grand jury in the Southern District of New York in February of 2010. He moved to dismiss all three counts against him; the District Court granted his motion as to one but denied it as to the other two counts. He proceeded to trial on the two counts: (1) a violation of the National Stolen Property Act, 18 U.S.C. § 2314; and (2) a violation of the Economic Espionage Act, 18 U.S.C. § 1832. Following an eight-day trial in the United States District Court for the Southern District of New York, a jury found Aleynikov guilty on both counts. He was sentenced to 97 months of imprisonment.

Aleynikov served 51 weeks in prison while his appeal was pending. On February 16, 2012, the United States Court of Appeals for the Second Circuit reversed his conviction and ordered him acquitted and released immediately, concluding that his conduct did not violate federal law. *See United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012).

On August 2, 2012, New York state authorities arrested Aleynikov and charged him with state crimes based upon the same alleged conduct. On September 26, 2012, a New York grand jury indicted him on two charges: (1) unlawful use of secret scientific material in violation of N.Y.

6

Penal Law § 165.07; and (2) unlawful duplication of computer-related material in violation of N.Y. Penal Law § 156.30(1). The state criminal case remains pending.

On August 24, 2012, Aleynikov and his counsel sent a letter to Goldman seeking indemnification for over $2.3 million in attorney's fees and costs incurred in connection with the federal criminal proceedings and advancement of attorney's fees and costs related to the ongoing state criminal proceedings. The letter asserted that Aleynikov was entitled to indemnification and advancement under the By-Laws.

B.

On September 25, 2012, Aleynikov initiated this case in the United States District Court for the District of New Jersey seeking indemnification and advancement, as well as "fees on fees" incurred in attempting to obtain indemnification and advancement.

At the same time, Aleynikov filed a motion for summary judgment and requested entry of a preliminary injunction. On December 14, 2012, the District Court denied Aleynikov's summary judgment motion and request for a preliminary injunction, concluding that the factual record was insufficient to establish Aleynikov's entitlement to indemnification and advancement under the By-Laws. The District Court ordered expedited discovery to establish in the record the process for appointing officers and the practice of indemnifying employees at GSCo, in order to discover the meaning of the term officer in the By-Laws.

Following expedited discovery, the parties filed cross-motions for summary judgment. On October 16, 2013, the District Court granted Aleynikov's motion for summary judgment with respect to his claims for advancement and advancement-related fees. The District Court analyzed

7

Section 6.4 the By-Laws for ambiguity, exploring the plain meaning of vice president and concluding that the meaning of this term was unambiguous and entitled Aleynikov to indemnification and advancement. It proceeded to consider the extrinsic evidence anyway, concluding that the evidence submitted did not raise any genuine issues of material fact. Finally, the District Court explained that even if there were an issue of fact, it would apply the doctrine of *contra proferentem* to construe any ambiguities against Goldman, the unilateral-drafter of the By-Laws. It denied Aleynikov's motion for summary judgment with respect to indemnification and indemnification-related fees pending further discovery on the total monetary amount due. The District Court also denied Goldman's cross-motion for summary judgment. Goldman filed a timely notice of appeal and sought to stay the District Court's order pending appeal and to expedite the appeal. This Court denied Goldman's motion for a stay pending appeal, granted its motion to expedite the appeal, and referred the additional issue of the Court's appellate jurisdiction to the merits panel. After oral argument, we stayed the District Court's order pending our resolution of this appeal.

## II.

### A.

The District Court had diversity jurisdiction over this case under 28 U.S.C. § 1332. Aleynikov challenges our appellate jurisdiction. Before we turn to the merits of the case, "we must first be satisfied that this court has appellate jurisdiction." *Metro Transp. Co. v. North Star Reinsurance Co.*, 912 F.2d 672, 675 (3d Cir. 1990). "We exercise plenary review over all jurisdictional questions." *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).

The District Court's order does not constitute a final decision, so it cannot be appealed under 28 U.S.C. § 1291. Goldman contends that we have jurisdiction over its appeal of the District Court's order granting summary judgment under 28 U.S.C. § 1292(a)(1), which provides for appellate jurisdiction over interlocutory orders that grant injunctive relief. Although the District Court did not use the term "injunction" in its order, that is not determinative; we must evaluate the nature of the relief granted to determine whether the remedy is injunctive. *Cohen v. Bd. of Trustees of the Univ. of Med. & Dentistry of N.J.*, 867 F.2d 1455, 1466 (3d Cir. 1989) (en banc) ("If the order grants part of the relief requested by the claimant, the label put on an order by the district court does not prevent the appellate tribunal from treating it as an injunction for the purposes of section 1292(a)(1).").

For a district court's order to be considered an injunction for the purposes of § 1292(a)(1), "[t]he order must not only adjudicate some of the relief sought in the complaint; it must also be of such a nature that if it grants relief it could be enforced pendente lite by contempt if necessary." *Id.* at 1465 (citing Wright, Miller, Cooper & Gressman, *Federal Practice & Procedure*, § 3922, 29 (1977)). Alternatively, "specific enforcement of contractual undertakings by an order against the person has been regarded as a classic form of equitable relief . . . . and if it is granted the order falls within section 1292(a)(1)." *Id.* at 1468.

The order here adjudicated relief sought in Aleynikov's complaint and appears to be enforceable through the District Court's contempt powers, given the ongoing and immediate nature of the obligation and the role that the

9

District Court assumed in overseeing the payments.[1] Alternatively, the order could be seen as one for specific performance of a contractual duty. It compels Goldman to advance attorney's fees in order to fulfill its alleged contractual obligation under the By-Laws. The obligation is immediate, ongoing, indeterminate, and could be repaid depending on the outcome of the state criminal proceeding. Under the factors set forth in *Cohen*, the District Court's order appears to be an immediately appealable injunction.

Aleynikov contends that the order merely requires the payment of money in an action at law, and is therefore not an appealable injunction. An order is legal if it compels the payment of money that is past due or compels specific performance of a past due monetary obligation. *Pell v. E.I. DuPont de Nemours & Co. Inc.*, 539 F.3d 292, 307 (3d Cir. 2008). But where an order for the payment of money is forward-looking and involves an amount that cannot be calculated with specificity, it is equitable. *Id.* Here, the District Court's order is clearly forward-looking and

---

[1] The District Court's order stated that Goldman was to pay Aleynikov's legal fees and expenses "periodically as they are incurred going forward" and appointed a Magistrate Judge to "supervise the payment process." App. 1. It ordered that Aleynikov and his attorneys should "periodically submit copies of their bills and time records in support of periodic applications for fees and expenses." *Id.* And "Goldman will be given a reasonable period of time, to be set by the Magistrate Judge, to review such submissions and submit any objections." *Id.* at 2. By prescribing the procedure for the payments and appointing a Magistrate Judge to oversee that process, the District Court assumed a continuing role in enforcing its order.

indeterminate, as it requires Goldman to pay Aleynikov's attorney's fees as he incurs them.

We hold that the District Court's order requiring the advancement of legal fees is injunctive and therefore immediately appealable under 28 U.S.C. § 1292(a)(1). We join our sister circuits who have concluded the same under similar conditions. *See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1222-23 (10th Cir. 2009) (concluding that an order granting an executive advancement was an immediately appealable injunction because it required specific performance of a contract); *Pac. Ins. Co. v. Gen. Dev. Corp.*, 28 F.3d 1093, 1096 (11th Cir. 1994) (holding that an order directing an insurer to advance legal fees pursuant to an insurance policy was an immediately appealable injunction).

Goldman also urges us to exercise our pendent appellate jurisdiction over the issues raised in its cross-motion for summary judgment, which the District Court denied. Pendent appellate jurisdiction "allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 202-03 (3d Cir. 2001). The doctrine is "narrow," and "should be used sparingly, and only where there is sufficient overlap in the facts relevant to both the appealable and nonappealable issues to warrant plenary review." *Id.* at 203 (internal quotation marks and emphasis omitted) (quoting *In re Montgomery Cnty.*, 215 F.3d 367, 375-76 (3d Cir. 2000)).

The appealable order – the District Court's partial grant of summary judgment ordering that Goldman advance Aleynikov's attorney's fees for his state criminal action –

raises the issue of the meaning of officer as used in Goldman's By-Laws and whether the term includes Aleynikov. Goldman's cross-motion for summary judgment also turned on the meaning of the term officer and whether Aleynikov could be considered one. Therefore, our adjudication of the issues properly before us would necessarily resolve whether Goldman's cross-motion was properly denied. We would not need to evaluate additional facts or legal arguments to resolve Goldman's cross-motion. Because the issues are so intertwined, this is one of the relatively rare instances where we should use our discretion to exercise pendent appellate jurisdiction. We will therefore reach the issue of whether the District Court erred in denying Goldman's cross-motion for summary judgment; however, as we conclude below that the By-Laws are ambiguous and genuine issues of material fact preclude summary judgment, the District Court did not err in denying Goldman's motion.

## B.

Having satisfied ourselves that we have appellate jurisdiction, we turn to the standard of review. "We review a grant of summary judgment de novo, and thus apply the same standard as that used by the District Court." *Am. Eagle*

12

*Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 580-81 (3d Cir. 2009).[2]

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Bowers v. NCAA*, 475 F.3d 524, 535 (3d Cir. 2007). A motion for summary judgment is properly denied if "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

### III.

The propriety of the District Court's grant of summary judgment in Aleynikov's favor hinges on the interpretation of

---

[2] Our review is plenary even though the District Court's grant of summary judgment operated as an injunction. Ordinarily we review a district court's grant of an injunction for abuse of discretion. *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 178 (3d Cir. 2008). But where, as here, the injunction results on a summary judgment motion, our review is plenary. *See Cureton v. NCAA*, 198 F.3d 107, 113 (3d Cir. 1999) (exercising plenary review over an entry of a permanent injunction on a motion for summary judgment).

13

the term officer. We will begin with a brief overview of corporate by-laws and indemnification and advancement provisions under Delaware law.[3] We will then consider whether, in the context of Section 6.4 of Goldman's By-Laws, the word officer is ambiguous and, if so, whether extrinsic evidence can resolve this ambiguity.

## A.

Delaware has enacted statutory provisions giving corporations and their subsidiaries the ability to provide for mandatory indemnification and advancement in their corporate charters, by-laws, and other agreements. Section 145 of the Delaware Code allows business entities to indemnify or provide advancement to an individual involved in a lawsuit by reason of fact that he or she is or was a director, officer, employee, or agent of the corporation, partnership, or other enterprise. 8 Del. Code § 145(a), (e). This "allows corporate officials to defend themselves in legal proceedings 'secure in the knowledge that, if vindicated, the corporation will bear the expense of litigation.'" *Homestore Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005) (quoting *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998)).

Indemnification and advancement are related but distinct avenues by which a business entity pays for an individual's legal expenses. In both, the corporation pays the legal expenses of the officer, director, or other employee when that individual is accused of wrongdoing in the course of performing duties to the corporation. For indemnification, the corporation reimburses the individual for his or her legal

---

[3] The parties agree that this case is governed by Delaware law, as GS Group is a corporation organized under the laws of the state of Delaware.

14

expenses once he or she has been successful in the underlying proceeding on the merits or otherwise. *Homestore*, 888 A.2d at 211. For advancement, on the other hand, the corporation pays legal expenses on an ongoing basis in advance of the final disposition of the lawsuit, provided that the individual must repay the amount advanced if it turns out he or she is not entitled to be indemnified – i.e., he or she is not successful on the merits or otherwise in the underlying lawsuit. 8 Del. Code § 145(e).

Advancement provides individuals "with immediate interim relief from the personal out-of-pocket financial burden of paying the significant on-going expenses inevitably involved with investigations and legal proceedings." *Homestore*, 888 A.2d at 211. Section 145(e) – providing for advancement – is permissive, but many corporate charters, by-laws, and agreements set forth mandatory advancement provisions. *Id.* at 212. The right to advancement survives even if the entity from which advancement is sought "is alleging that the plaintiff has committed perfidious acts against it." *DeLucca v. KKAT Mgmt., LLC*, No. 1384-N, 2006 WL 224058, at *11 (Del. Ch. Jan. 23, 2006).

The Delaware General Assembly's enactment of the statute promoting advancement "plainly reflect[s] a legislative determination to avoid deterring qualified persons from accepting responsible positions with financial institutions for fear of incurring liabilities greatly in excess of their means." *Ridder v. CityFed Fin. Corp.*, 47 F.3d 85, 87 (3d Cir. 1995). Mandatory advancement provisions are "broadly construed" in order to provide individuals entitled to advancement with "immediate interim relief." *Brown v. LiveOps, Inc.*, 903 A.2d 324, 327 (Del. Ch. 2006).

15

B.

We turn now to our analysis of the By-Laws. By-laws are interpreted in accordance with "the rules used to interpret statutes, contracts, and other written instruments." *Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001). The terms are given their plain meaning, like terms in any other contract. *Activision Blizzard, Inc. v. Hayes*, No. 497, 2013 WL 6053804, at *3 (Del. Nov. 15, 2013). "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "[T]he fact that the parties offer two different interpretations does not create an ambiguity." *Activision Blizzard*, 2013 WL 6053804, at *3. We analyze the By-Laws for ambiguity "through the lens of 'what a reasonable person in the position of the parties would have thought the [By-Laws] meant.'" *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010) (quoting *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1197 (Del. 1992)). We begin by inquiring whether the relevant provision of Section 6.4 of the By-Laws is unambiguous. Then, concluding that the relevant provision is ambiguous, we look beyond the By-Laws to attempt to determine the parties' meaning. Finally, we consider whether the doctrine of *contra proferentem* properly applies here.

1.

The By-Laws' use of the term "officer" is crucial to the outcome, because a person is entitled to indemnification and advancement under the By-Laws if he or she is made a party to an action by reason of the fact that he or she "is or was a director, officer, trustee, member, stockholder, partner, incorporator or liquidator of a Subsidiary of [GS Group]."

16

App. 117. Aleynikov's only claim to indemnification and advancement rests on whether he is an "officer" of GSCo, a subsidiary of GS Group, as he does not, and cannot, claim any other entitlement under the By-Laws.

For the purposes of indemnification and advancement concerning subsidiaries that are not corporations, like GSCo, the By-Laws state: "the term 'officer' shall include in addition to any officer of such entity, any person serving in a similar capacity or as the manager of such entity." App. 118. Yet, after stating the applicable law on contract interpretation, the District Court observed that "the plain and ordinary meaning of 'vice president' is, of course, the starting point and touchstone of the analysis." App. 27. It then proceeded to evaluate the dictionary definition and meaning of vice president in the case law to conclude that the usual and ordinary meaning of vice president is unambiguous and means that Aleynikov is an officer. The District Court's focus of its analysis on the meaning of the term vice president, which does not appear at all in Section 6.4 of the By-Laws, was its first and most significant error. The term *officer* appears in the relevant language of the By-Laws, and it is the interpretation of the term officer that determines whether Aleynikov is entitled to advancement. In analyzing whether vice president is ambiguous, the District Court analyzed a term that does not appear in the relevant portion of the contract.

Having noted this crucial error of interpretation, we move to the text of the relevant part of Section 6.4 to determine whether it is unambiguous. At first blush, the definition of "officer" with respect to non-corporate subsidiaries is fairly circular. "Officer," as used in the By-Laws, includes: (1) any officer; (2) a person serving in a similar capacity; or (3) a person serving as the manager of the

non-corporate subsidiary. We read the first use of "officer" as setting forth a contractual category.[4] It defines "officer" for the purposes of entitling a person qualifying under that definition to indemnification and advancement. For this reason, this apparent circuity – defining "officer" as including any officer – is not problematic in and of itself. But the second use of the word officer in this provision remains undefined. From the face of the instrument, it is not immediately apparent what characteristics make someone an officer.

We look to the dictionary definition of officer for "assistance in determining the plain meaning" of this undefined term. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006). We look here first "because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." *Id.* Black's Law Dictionary defines officer as "a person who holds an office of trust, authority, or command." Black's Law Dictionary 1193 (9th ed. 2009). Merriam Webster defines it similarly. *See* Merriam-Webster Collegiate Dictionary (11th ed. 2009) ("One who holds an office of trust, authority, or command."). According to American Heritage Dictionary, an officer is "[o]ne who holds an office of authority or trust in an organization, such as a corporation." Am. Heritage Dictionary of the English

---

[4] To avoid confusion, we use "officer," with quotation marks, when referring to the term as used in the first sense – the contractual category defining the term for the purposes of indemnification and advancement. We use officer, without quotation marks, when discussing the term as used within the definition.

18

Language (5th ed. 2013). Random House College Dictionary adds to the definition an element of election or appointment, defining officer as "a person appointed or elected to a position of responsibility or authority in an organization." Random House Coll. Dictionary (Revised Ed. 1980).

We can glean from these definitions that the plain meaning of the term officer is someone holding a position of trust, authority, or command. Only one of the four definitions suggests that for a person to be considered an officer, he or she must be elected or appointed to that position. We therefore conclude that the election or appointment requirement cannot properly be considered a part of the ordinary, dictionary definition of officer.

Equipped with this definition of officer, we consider whether the use of this definition gives meaning to the provision that "'officer' shall include in addition to any officer of such entity, any person serving in a similar capacity or as the manager of such entity." App. 118. Applying the dictionary definition here results in the reading that "officer" as a contractual category is defined as someone holding a position of trust, authority or command *and* a person serving in a similar capacity. This reading results in a tautology – officer as defined using the dictionary definition and "any person serving in a similar capacity" mean the same thing. Using the dictionary definition, therefore, does not result in an unambiguous provision; rather, what appears at first blush to be circular instead becomes repetitive.

Goldman suggests that we should read this clause as providing that an "officer" for the purposes of indemnification and advancement includes: "general purpose, normal-course officers of non-corporate entities," along with people serving in similar capacities and managers.

19

Goldman Br., at 31.  Goldman maintains that at GSCo, these "general purpose, normal-course officers" are those, and only those, appointed by formal, written resolution of the General Partner of GSCo.  This definition is unavailing for several reasons.  First of all, there is no generally promulgated document stating who such "general purpose, normal-course officers" are at GSCo or stating that officers are appointed only by written resolution of the General Partner.[5]  Therefore, it is not apparent that these "normal-course officers" would be readily ascertainable, such that the plain meaning of the term officer in the By-Laws would be apparent as applied to GSCo.  Second, to read this provision in the way Goldman urges – that officers are "general purpose, normal-course officers" appointed pursuant to written resolutions of Goldman's General Partner – we would have to violate the "well-established principle that in construing a contract a court cannot in effect rewrite it or supply omitted provisions." *L.Q. v. P.Q.*, 466 A.2d 1213, 1217 (Del. 1983).  Finally, this reading would conflict with the dictionary definition of officer – someone holding a position of trust, authority, or

---

[5] We discuss the import of these written resolutions in significantly more detail below.  Since we find the provision in the By-Laws to be ambiguous, the resolutions may indeed be of use in determining what the contract means as to officers at GSCo.  But they cannot supply the meaning of the term when the By-Laws make no mention of appointment by written resolution and Goldman can point to no generally promulgated documents identifying officers as appointed only by written resolution.  A supplied definition cannot be a term's "plain meaning" if it can be known only to a select few in the organization when the readership of the provision is far wider than these select few.

command.  We therefore decline to adopt Goldman's reading.

If there were a readily-identifiable, industry-specific common meaning of the term officer, the application of this meaning would perhaps render Section 6.4 of the By-Laws unambiguous.  We analyze ambiguity "through the lens of 'what a reasonable person in the position of the parties would have thought the contract meant.'"  *Kuhn Constr., Inc.*, 990 A.2d at 396 (quoting *Rhone-Poulenc Basic Chem. Co.*, 616 A.2d at 1197).  If there were a common meaning of the term officer in the non-corporate investment banking industry, such that its plain meaning would be apparent from the face of the By-Laws to "a reasonable person" in that industry, we could apply that meaning and conclude that the provision is unambiguous.  But we have not been supplied with such a commonly-understood meaning of the term officer.

We therefore conclude that the provision of the By-Laws defining "officers" for the purposes of indemnification and advancement at non-corporate subsidiaries as "any officer of such entity, [and] any person serving in a similar capacity or as the manager of such entity" is ambiguous.  App. 118.  It is circuitous, repetitive, and most importantly, "fairly or reasonably susceptible to more than one meaning."  *Alta Berkeley VI C.V.*, 41 A.3d at 385.  Officer could mean simply someone occupying a position of trust or authority, or it could mean someone elected or appointed to that particular position, or it could mean something else entirely in the relevant industry.  The failure to define the term suggests that it has, or was meant to have, some meaning that would be obvious to readers of the document.  Unfortunately, we cannot ascertain that meaning from the face of the document or by resorting to

21

dictionary definitions.[6]

2.

"When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). In looking at extrinsic evidence to interpret an ambiguous contractual provision, "a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Id.* at 1233.

We pause to note that resorting to extrinsic evidence in this case is problematic. Because the By-Laws are a unilaterally-drafted agreement – neither Aleynikov nor the many other employees of GSCo who would be interested in whether they are eligible for indemnification or advancement had any part in drafting them – many types of extrinsic

---

[6] Goldman urges us to use "undisputed background facts" in aid of finding the term's plain meaning. But we cannot use these undisputed background facts here. The evidence held out as "undisputed background facts" regarding title inflation relates to the term vice president, not officer, so we cannot use it in analyzing officer for ambiguity. We cannot use evidence held out as "undisputed background facts" regarding the appointment process for officers at GSCo, because there are genuine issues of material fact regarding whether that process should be considered for determining who an officer is at GSCo.

evidence in this case would be irrelevant. "[U]nless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language." *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998) (emphasis in original). "[A]lthough advancement provisions in corporate instruments often are of less than ideal clarity, rarely is resort to parol evidence appropriate or even helpful, as corporate instruments addressing advancement rights are often crafted without the involvement of the parties who later seek advancement." *DeLucca*, 2006 WL 224058, at *6. However, as we discuss below, it is inappropriate to apply the doctrine of *contra proferentem* and construe the ambiguities against the unilateral drafter, because we are considering whether Aleynikov can even claim status as a party benefited under the By-Laws. So we are left in a bind: most extrinsic evidence should not be considered because Goldman unilaterally drafted the By-Laws, yet we should not construe ambiguities against Goldman because we are trying to determine if Aleynikov even is a party to the contract.

We conclude that there are two types of extrinsic evidence that are relevant to resolving the ambiguity presented here: "course of dealing" evidence and "trade usage" evidence. *Eagle Indus.*, 702 A.2d at 1233. These types of extrinsic evidence go beyond the subjective intent of the drafting party to shed light on how reasonable individuals in the investment banking industry and at GSCo specifically would have interpreted the term officer. The parties have introduced three categories of extrinsic evidence that we may properly consider as evidence of course of dealing and trade

23

usage.[7] Evidence of GSCo's procedure for appointing officers and of GSCo's record of providing indemnification and/or advancement can properly be viewed as evidence of GSCo's course of dealing with the title officer and with awards of indemnification and advancement. Evidence of title inflation in the investment banking industry and industry usage of the title of vice president can be viewed as evidence of trade usage of titles that may connote officer-status to people inside the investment banking industry. We evaluate each type of extrinsic evidence to determine whether this evidence is relevant and helpful in resolving the ambiguity and whether there are genuine issues of material fact regarding this evidence that preclude summary judgment.

Goldman offered evidence from discovery regarding GSCo's procedure for appointing and removing officers. It produced eleven documents titled "Written Consent of the General Partner of Goldman, Sachs & Co." These documents appointed and/or removed individuals as officers of GSCo. Goldman also introduced evidence that the persons occupying the position of officer, as appointed in the documents, were

---

[7] Aleynikov introduced evidence that he believed he was an officer of GSCo. But he also admitted that he had never read the By-Laws or considered his right to indemnification and advancement before his arrest. We do not consider this extrinsic evidence for two reasons. First, it would not be appropriate to consider "self-serving parol evidence submitted by the parties, whose recollections as to the intended meaning of the agreements predictably differ." *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 214 n.4 (3d Cir. 2005). Furthermore, as the District Court observed, "Aleynikov's possession of rights does not necessarily depend on his prior awareness of them." App. 25.

publicly identified in regulatory filings.

In considering the interpretive value of this extrinsic evidence, the District Court erred in improperly weighing the evidence to neutralize the value of GSCo's process for appointing officers. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The District Court discounted the weight of the appointment procedure because Goldman did not point to a document that established or memorialized this procedure for appointing officers. It also discounted the evidence about identifying officers in public filings, reasoning that the evidence suggested that the appointments had a regulatory purpose, which had no bearing on the meaning of officer for indemnification and advancement purposes. Finally, it discounted the evidence because the Written Consents were labeled "confidential" and the appointment process was not widely disseminated to the GSCo employee population. While these considerations may indeed weigh on whether the appointment procedure deserves credence in interpreting the terms of the contract, this is a factual determination for the jury to decide. The District Court erred in improperly weighing and discounting the value of this evidence.

Goldman introduced evidence about its record of providing indemnification and/or advancement to other individuals at GSCo. Over a six year period, fifty-three people associated with GSCo were considered for advancement and/or indemnification. Of these fifty-three, Goldman paid the attorney's fees for fifty-one. Aside from Aleynikov, Goldman refused to pay indemnification and/or advancement for one other person who sought it, also a GSCo vice president. However, of the fifty-one whose fees

Goldman paid, fifteen were GSCo vice presidents. Goldman put forward evidence suggesting that for at least some of these individuals, Goldman was invoking its discretion in agreeing to pay the fees, even if the individual was not necessarily entitled to indemnification or advancement under the By-Laws.

The District Court discounted this evidence as a post-hoc characterization of the payment decisions and expressed doubt as to the discretionary nature of the payments, drawing particular attention to the fact that for some of these individuals, indemnification and advancement were clearly mandatory under the By-Laws. We decline to discount this evidence for these reasons. While for some of the individuals, indemnification and advancement would have been clearly due under the By-Laws, this does not preclude Goldman from first determining whether it *wants* to pay attorney's fees, and then, if it decides it does not want to do so, determining whether it *must*. While the characterization of these decisions as discretionary could diminish their relevance to interpreting the By-Laws, we leave that question to the District Court at trial. Depending on how this evidence of Goldman's "course of dealing" is presented, it could have some relevance to the meaning of the term officer.[8] If the

---

[8] The dissent contends that this "course of dealing" evidence does not speak to the mutual understanding of the contracting parties, and is therefore irrelevant. We agree, to a certain extent, that this evidence could have no relevance. Nevertheless, we leave this question to the District Court to decide based upon the substance of the evidence and the manner in which it is presented.

District Court finds this evidence relevant and admissible, it is up to a jury to determine how these prior instances of indemnification and advancement bear on the meaning of the term officer at GSCo.

Goldman introduced "trade usage" evidence, which Aleynikov has not rebutted, from publications like The Economist and The Los Angeles Times and deposition testimony showing that title inflation in the financial services industry is prevalent and the title of vice president is not particularly meaningful. *See* App. 465 ("[I]n the investment banking and brokerage industries, just about everyone is a

---

If Goldman's past decisions regarding indemnification and advancement are all characterized as discretionary, they would have no value in establishing Goldman's course of dealing in providing indemnification and advancement *under the By-Laws*, which is the issue here. But in the record before this Court, Goldman has not characterized all of its decisions as discretionary. The evidence of some instances where Goldman advanced attorney's fees as required under the By-Laws, as opposed to in its discretion, could be relevant as course of dealing evidence.

Similarly, the evidence regarding Goldman's appointment procedure could have no relevance. We are only presented with the Written Consents, which are marked as confidential. If these Written Consents were not widely disseminated, and the individuals identified therein were not held out as officers to the employee population of GSCo, the evidence would be irrelevant. But if instead, these individuals were known to the employee population as officers or the employee population knew of the appointment process, even if the Written Consents were not publicized, the evidence would be relevant.

vice president . . . ."); App. 468 ("Almost everybody in banking from the receptionist upwards is a president of some sort."); App. 470 ("[M]anagement titles such as senior vice president . . . have spread so widely that 'in many cases being a vice president means nothing.'"). The evidence tends to show that vice president is merely "a functional title, because it connotes a level of seniority between associate and managing director, and as distinguished from an officer title, which is somebody who's appointed through the process." App. 945.

The District Court discounted this evidence of title inflation and the industry understanding of the term vice president. The District Court placed the burden of this inartfully-bestowed title on Goldman, penalizing Goldman for the industry's profligacy in conferring the title of vice president. The District Court also confusingly observed that "the folkways of the financial services industry are not necessarily determinative here," App. 25, even though the norms of the relevant industry are properly considered extrinsic evidence, *Eagle Industries, Inc.*, 702 A.2d at 1233, and are relevant to ambiguity, which considers how a reasonable person in the position of the parties would interpret the contract term, *Kuhn Construction, Inc.*, 990 A.2d at 396. We emphasize yet again that it is the meaning of the term *officer* – the term appearing in the By-Laws – that the extrinsic evidence must aid in interpreting. But the industry usage of the term vice president is still relevant extrinsic evidence. Aleynikov hangs his hat only on his vice president title in claiming entitlement to advancement, and industry usage of this term informs industry understanding of who qualifies as an officer, and in particular, whether a GSCo vice

president can be considered an officer.[9]

Goldman's extrinsic evidence raises genuine issues of material fact. "[W]here reasonable minds could differ as to

---

[9] The dissent argues that due to the unilateral nature of a company's governing document, there can be no relevant evidence regarding the mutual understanding of the agreement's meaning. We disagree. Evidence of "trade usage" of the terms officer and vice president seems to us to be particularly relevant to the parties' mutual understanding, as it addresses the reasonable expectations of employees at GSCo.

Each industry has its idiosyncratic terms and titles, the meaning of which is widely known to members of the industry and the individual companies, but which suggest a different meaning to those on the outside. Goldman has suggested that the term "vice president" falls into this category. Therefore, evidence of title inflation in the financial services industry and evidence of GSCo employees' views on the meaning of "officer" and "vice president" are particularly relevant to informing how a reasonable employee at GSCo would interpret the term officer in the By-Laws.

Aleynikov is free to present his own evidence with respect to the meaning of this term at GSCo, which he did not do before this Court except to present his own subjective view. The evidence presented to this Court strongly suggests that to the extent that Aleynikov understood himself to be an officer, this was unreasonable *in the relevant industry*, given the trade usage of the words "officer" and "vice president." We stop short of making this determination, as it is a factual question to be resolved by a jury. But such evidence of trade usage is surely relevant to shed light on the parties' reasonable understanding of the terms of the agreement.

the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence. In those cases, summary judgment is improper." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012). A jury must determine the interpretive value of Goldman's extrinsic evidence in resolving the ambiguity in the By-Laws.

3.

The District Court concluded that even if the term officer was ambiguous, the concept of *contra proferentem* would apply to resolve any ambiguities against the corporate drafter, here, Goldman. The doctrine of *contra proferentem* is well established in Delaware contract law. When one side of a contract was unilaterally responsible for the drafting, courts apply *contra proferentem* and construe ambiguous terms against the drafter. *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013).

Goldman contends that we should not apply the doctrine of *contra proferentem* here because we are presented with the threshold question of whether a person was a party to or intended beneficiary of a corporate instrument. Aleynikov argues that *contra proferentem* applies whenever one party has sole control over the drafting of the agreement and Delaware courts do not consider extrinsic evidence of a drafter's intent when the agreement was not the product of bilateral negotiation.

We have found no Delaware case law specifically addressing whether *contra proferentem* can and should apply where there is ambiguity over whether a plaintiff is a party to or beneficiary of a contract. Generally, the cases in which the Delaware courts have applied *contra proferentem* have concerned situations in which it was clear that the party

invoking the doctrine had rights under the agreement and the ambiguity went to the *scope* of those rights. *See e.g.*, *Norton*, 67 A.3d at 360 (discussing *contra proferentem* in the context of a dispute involving a limited partnership agreement between limited partners, a general partner, and the board of directors). In particular, the courts have applied the doctrine to construe an ambiguity in an insurance policy against the insurance company that drafted the policy where the policy-holder – clearly a party to the agreement – had no role in drafting the ambiguous provision. *See e.g.*, *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 630-31 (Del. 2003) (applying *contra proferentem* to construe an ambiguity in an insurance policy's exclusion provision against the insurance company where the insured had no role in drafting the exclusion).

While we have found no case law directly on point, a close reading of the applicable Delaware case law suggests that the doctrine is inapplicable here. The Delaware Court of Chancery has written that *contra proferentem* "protects the reasonable expectations of people who join a partnership or other entity after it was formed and must rely on the face of the operating agreement to understand *their rights and obligations* when making the decision to join." *Stockman v. Heartland Indus. Partners, L.P.*, Nos. 4227-VSC, 4427-VCS, 2009 WL 2096213, at *5 (Del. Ch. July 14, 2009) (emphasis added). This language suggests that *contra proferentem* applies to determine the scope of a person's rights under a contract which they had no role in drafting; it does not suggest that the doctrine applies to determine whether a person has rights and obligations under – i.e., whether he or she is a party to or beneficiary of – a contract.

"[T]he bylaws of a Delaware corporation constitute part of a binding broader contract among the directors,

officer, and stockholders formed within the statutory framework of the [Delaware General Corporation Law]." *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013).[10] Once it is determined whether or not a person qualifies as an officer under the By-Laws, *contra proferentem* might appropriately apply to resolve any ambiguities in the scope of the right to indemnification and advancement. However, we conclude that *contra proferentem* has no application in resolving whether a person has rights under the contract at all – here, whether Aleynikov

---

[10] The dissent criticizes our "reliance" upon this case because it does not concern *contra proferentem*. We do not cite this case for *contra proferentem* principles, but rather as a statement of the parties to the By-Laws as a contract. The proposition that by-laws are a contract among certain stakeholders is not novel or controversial. *See, e.g. Airgas, Inc. v. Air Prods. and Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among the corporation's shareholders; therefore, our rules of contract interpretation apply."). We rely upon this case for the sole purpose of demonstrating that Aleynikov's status as a *party* to the By-Laws is in question, because he has not established that he is a director, officer, or stockholder of Goldman.

is an officer of GSCo. [11] Applying the doctrine of *contra proferentem* in this circumstance would put the cart before the horse. It would have us resolve ambiguities in favor of a non-drafting individual in order to determine whether that non-drafting individual was even subject to the agreement.

We therefore decline to apply the doctrine of *contra proferentem* and hold that the District Court erred in doing so. While resort to some types of extrinsic evidence specifically relating to Goldman's intent might be inappropriate, as discussed above, resort to extrinsic evidence regarding course of dealing and trade usage to resolve the ambiguity does not seem inappropriate even where Goldman unilaterally drafted the agreement. The use of course of dealing and trade usage evidence of the sort we discussed above "can speak to the intent of *all* parties to a contract," *SI Mgmt. L.P.*, 707 A.2d at 43 (emphasis in original), as it addresses the general operations at GSCo and who reasonable people in the

---

[11] The dissent maintains that we should apply *contra proferentem* to construe ambiguities in the By-Laws against Goldman because, among other reasons, doing so furthers the public policy of protecting the reasonable expectations of stakeholders who join an entity after the governing document has been drafted. We note that this case does not implicate this public policy. It is undisputed that Aleynikov did not review any part of the By-Laws before he began working at GSCo or during his time there. App. 428. Nor did Aleynikov expect that Goldman would pay his legal fees if he was sued or charged criminally; he admitted that the "thought never crossed [his] mind." App. 430. Furthermore, as discussed in more detail in footnote 9, *infra*, consideration of trade usage extrinsic evidence protects the reasonable expectations of employees at GSCo.

investment banking industry would consider an officer to be. Absent consideration of Aleynikov's subjective views on his officer-status, which would be neither helpful nor appropriate, this is the closest we can get to ascertaining how employees at GSCo, who may or may not be eligible for indemnification and advancement at some point, would view the language of the contract. On remand, the fact finder should consider the extrinsic evidence presented and determine whether that evidence resolves the ambiguity to ascertain "which of the reasonable readings [of the term officer] was intended by the parties." *Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294, 309-10 (Del. Ch. 2002).

IV.

For the foregoing reasons, we vacate the District Court's order granting summary judgment in Aleynikov's favor on the advancement issue and remand to the District Court for further proceedings consistent with this opinion. Because we have concluded that the relevant terms of the By-Laws are ambiguous and there are genuine issues of material fact raised in resolving that ambiguity, summary judgment is not appropriate for either party at this time. Therefore, while we exercise supplemental jurisdiction over the District Court's denial of Goldman's cross-motion for summary judgment, we conclude that motion was properly denied and affirm the District Court on this issue.

FUENTES, *Circuit Judge*, dissenting in part.

I agree with the majority that the term "officer" as used in the advancement provision of the By-Laws is ambiguous.  But unlike the majority, I believe that Delaware has clearly stated the rule for deciding between competing interpretations of an ambiguous term: courts should construe the ambiguous term in the corporate instrument against the drafter, rather than inviting the use of extrinsic evidence to decipher the term's meaning.  Delaware has never suggested that there is an exception to its *contra proferentem* rule where the ambiguity concerns "whether a plaintiff is a party to or beneficiary of a contract."  Maj. Op. at 28.  Thus, I would resolve the ambiguous term "officer" against Goldman Sachs and conclude, as a matter of law, that Sergey Aleynikov, a vice president at Goldman, was an officer and therefore entitled to advanced legal fees.  I believe Delaware law compels this conclusion, as does the public policy animating Delaware's interpretation of governing documents.

I therefore dissent.

I.

Under Delaware law, a court generally must allow a case involving an ambiguous contract to proceed to trial, so that the finder of fact may "consider the relevant extrinsic evidence in aid of identifying which of the reasonable readings was intended by the parties." *Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294, 309 (Del. Ch. 2002) (citing *Eagle Indus. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).  However, Delaware follows a different rule where the ambiguous contract at issue is a

1

firm's governing document. *Stockman v. Heartland Indus. Partners, LLP*, 2009 WL 2096213, at \*5 (Del. Ch. July 14, 2009). Where such a governing document "makes promises to parties who did not participate in negotiating the agreement, Delaware applies the general principle of *contra proferentem*," and construes ambiguous provisions against the drafter without resorting to extrinsic evidence. *Id.*; *see also SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 42-44 (Del. 1998) (applying *contra proferentem* when interpreting a partnership agreement); *Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 935 (Del. Ch. 2012) (applying *contra proferentem* when interpreting a certificate of incorporation).

This rule applies where the ambiguous provision at issue concerns advancement.[1] *See Stockman*, 2009 WL 2096213, at \*5; *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at \*6 (Del. Ch. Jan. 23, 2006). Indeed, if anything, Delaware's impulse to construe governing instruments against their drafters applies with greater force to advancement provisions, because "Delaware has a strong public policy in favor of [advancement]." *Id.* at \*7; *see also Homestore, Inc*, 888 A.2d at 211 (Del. 2005).

---

[1] Advancement is related to, but distinct from, indemnification. Indemnification provides reimbursement of legal expenses incurred by corporate officials in legal proceedings, while "[a]dvancement provides corporate officials with immediate interim relief from the personal out-of-pocket financial burden of paying the significant on-going expenses inevitably involved with investigations and legal proceedings." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005).

2

Goldman's By-Laws "make[] promises [of advancement] to parties who did not participate in negotiating the agreement." *See Stockman*, 2009 WL 2096213, at *5. Under Delaware law, then, Goldman must clearly notify its employees whether they are entitled to advancement under its By-Laws. *See id.* As the majority explains, Goldman has failed to do so. *See* Maj. Op. at 21. It has drafted an advancement provision susceptible to more than one interpretation. Accordingly, Delaware law requires us to apply the doctrine of *contra proferentem* and construe the provision against Goldman.

## II.

The majority has declined to apply Delaware's *contra proferentem* doctrine to the advancement provision of the By-Laws, because, it says, this dispute concerns whether Aleynikov is entitled to benefits under the By-Laws and not what those benefits include. The majority draws this distinction from its survey of Delaware cases: they apply *contra proferentem* to ambiguities as to the scope of a particular benefit, but are silent as to whether *contra proferentem* applies to ambiguities concerning an individual's entitlement to the benefit at all.

But the fact that Delaware has not applied *contra proferentem* in this exact circumstance does not mean that it would not do so were it given the opportunity. And given the clear language in Delaware case law stating that *contra proferentem* applies to ambiguous provisions of governing documents, I believe that it is not appropriate to craft an exception to Delaware's rule, unless the public policies motivating the rule are inapplicable to these circumstances.

3

In my view, however, the policies supporting Delaware's use of *contra proferentem* would plainly be furthered by applying the doctrine to this case. Specifically, construing the advancement provision against Goldman would (1) assure relevant stakeholders that they could reasonably rely on the face of governing documents of Delaware corporations, and (2) encourage Goldman to redraft the advancement provision in its By-Laws.

A.

Generally speaking, persons working for, and contracting with, a firm do not take part in the drafting of the document that creates the firm and governs its conduct. Rather, these persons and entitled—referred to here as the firm's stakeholders—conduct business with the firm after the governing document is drafted, and they must then decide whether to interact with the company based upon the representations of a unilaterally drafted document. *See Stockman*, 2009 WL 2096213, at *5 (noting that a firm's stakeholders "look to the governing instrument's words" when determining whether to engage with a company); *see also Bank of N.Y. Mellon v. Commerzbank Capital Funding Trust II*, 65 A.3d 539, 551 (Del. 2013). Delaware's robust application of *contra proferentem* accounts for this reliance interest by "protect[ing] the reasonable expectations of people who join a partnership or other entity after it was formed and must rely on the face of the operating agreement to understand their rights and obligations when making the decision to join." *Stockman*, 2009 WL 2096213, at *5. This "in turn benefits the entity by encouraging [stakeholders] to provide their capital, be it human or financial, at a lower cost than they would if they faced greater uncertainty." *Id.* at *8.

4

By rejecting the District Court's application of *contra proferentem*, we open the door for the finder of fact to determine a governing document's meaning using extrinsic evidence. But as the Delaware Chancery Court has noted, looking to extrinsic evidence to make sense of these documents, rather than construing them against their drafters as a matter of law, contravenes the public policy outlined above. Specifically, doing so "undermine[s] the ability of investors, officers, and other relevant constituencies to rely on the written text of governing instruments in deciding whether to invest in, work for, or supply debt capital to entities." *Id.* at *5. Such an outcome is bad for that firm's employees, its investors, and its shareholders.

The reasonable expectation of a vice president that he is an officer of a corporation (and is entitled to the benefits provided for in the By-Laws) is the very sort of expectation that Delaware corporate law clearly protects. Aleynikov "join[ed Goldman] . . . after it was formed" and "rel[ied] on the face of [its By-Laws]"—that is, a vague promise that he was an officer entitled to advancement—"to understand [his] rights and obligations when making the decision to join." *See id.* Honoring this reasonable expectation would assure other stakeholders that they, too, may rely on governing documents when doing business with entities organized in Delaware.

By contrast, today's majority opinion does not honor Aleynikov's reasonable expectations about the meaning of Goldman's By-Laws. In fact, as I explain below, it privileges the subjective views of Goldman about the meaning of the term "officer" over the reasonable expectations of its employees. Doing so "undermine[s] the ability of . . .

5

relevant constituencies to rely on the written text of governing instruments in deciding whether to invest in, work for, or supply debt capital to entities." *See id.*

B.

Delaware's application of *contra proferentem* serves another, related public policy: it encourages corporations to draft clear corporate instruments and ensures that "governing instruments of entities [are] interpreted consistently and that they [are] applied in a predictable manner." *Stockman*, 2009 WL 2096213, at *5; *accord Penn Mut. Life Ins. Co. v. Oglesby,* 695 A.2d 1146, 1149-50 (Del. 1997) (noting that it is incumbent on an issuer of securities to make the terms of its operative documents clear to a reasonable investor). By contrast, resorting to extrinsic evidence in construing ambiguous corporate instruments, as the majority does, "create[s] unpredictable results [and] reduce[s] the incentives for clear drafting." *Stockman*, 2009 WL 2096213, at *5.

By construing the advancement provision against Goldman, we would incentivize Goldman to rewrite the provision, so that it unambiguously states which of its employees are officers. But today's ruling encourages Goldman to do the opposite: keep the ambiguous language in place, thereby giving many persons the reasonable expectations they will receive advancement, while reserving the right to make unpredictable *post hoc* determinations about which former employees should be advanced attorney's fees and which shouldn't. Such an outcome is inconsistent with Delaware law.

III.

Aside from contravening Delaware's public policy, the majority's decision also misapplies Delaware's decisional law. The majority suggests that Delaware's *contra proferentem* doctrine applies only in resolving the scope of rights promised by a governing agreement, but that it "has no application in resolving whether a person has rights under the contract at all." Maj. Op. at 30. This is so, the majority states, because "'[t]he bylaws of a Delaware corporation constitute part of a binding broader contract among the directors, officers, and stockholders.'" *Id.* at 29 (quoting *Boilermakers Local 154 Ret. Fund. v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013)). In other words, the majority appears to suggest that, under Delaware law, one is entitled to the protections of *contra proferentem* only where the plaintiff is definitely a director, officer, or shareholder, but not where his membership in one of these groups is in question.

There are several problems with this position. First, *Boilermakers Local 154*, the case relied on by the majority, does not concern *contra proferentem.* It says nothing at all about when that doctrine applies to the interpretation of a firm's governing document.

Second, Delaware case law contradicts the notion that a corporate instrument is construed against the drafter only where the plaintiff is indisputably a shareholder, officer, or directors. Indeed, the Chancery Court has explained that *contra proferentem* protects all persons or entities "who provide benefits to the entity" and who "rely on [the governing document] in making their decisions about whether

7

to participate in the entity's activities." *Stockman*, 2009 WL 2096213, at \*8. The Delaware Courts believe that ensuring *all* relevant stakeholders that they can rely on their reasonable expectations about the meaning of governing instruments is essential to the existence of a smoothly running marketplace. As an employee, Aleynikov was entitled to rely on promises made to him in the By-Laws. *See id.* at \*5 (noting that the "concerns" motivating Delaware's robust application of *contra proferentem* in this context are "equally applicable to the directors, officers, and employees" of an organization); *see also* 8 Del. C. § 109(b) (providing that a corporation's by-laws may contain provisions relating to "the rights or powers of," among others its "employees").

Third, the majority does not explain why Delaware would apply *contra proferentem* where a governing document is vague as to the benefit's scope, yet would not apply the doctrine where the document is vague as to who receives it. As I note above, applying the doctrine in both contexts furthers Delaware public policy by encouraging clearer drafting, and by protecting the reasonable expectations of the relevant stakeholders.

In short, neither Delaware case law, nor Delaware public policy, favors the exception to Delaware's *contra proferentem* doctrine set forth by the majority. I therefore believe that we are obliged to apply *contra proferentem* here, and construe the advancement provision of the By-Laws against Goldman.

IV.

8

Today's ruling sanctions the consideration of two categories of so-called "course of dealing" evidence: (1) evidence that Goldman invoked its discretion in agreeing to pay the legal fees of individuals in similar positions to Aleynikov; and (2) internal Goldman documents that "appointed and/or removed individuals as officers of GSCo," as well as "evidence that the persons occupying the positions of officer, as appointed in the documents, were publicly identified in regulatory filings." Maj. Op. at 24. This evidence does not speak to the mutual understanding of the contracting parties. I therefore believe it is irrelevant and cannot be considered by the finder of fact.

In Delaware, "[t]he goal in reviewing the extrinsic evidence is to determine if there is a meaning of the [contract] such that an 'objectively reasonable party *in the position of either* bargainer would have understood the nature of the contractual rights and duties to be.'" *KFC Nat'l Council & Adver. Co-op., Inc. v. KFC Corp.*, 2011 WL 350415, at *15 (Del. Ch. Jan. 31, 2011) (emphasis added); *see also* Restatement (Second) of Contracts, § 223(1) (explaining that admissible "course of dealing" evidence concerns "a sequence of previous conduct *between the parties to an agreement* which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct" (emphasis added)).

By contrast, evidence that goes only to the subjective belief of one of the contracting parties about the meaning of the contract is irrelevant. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 55 (Del. Ch. 2001). As I explain above, rarely does an individual employed by, or investing in, a firm take part in the drafting of its governing document. Accordingly,

9

where a person's rights under a firm's governing agreement are at issue, there is no meeting of the minds as to the document's meaning. And by extension, of course, there can be no relevant evidence concerning the parties' mutual understanding of the agreement's meaning. *See, e.g., Bank of N.Y. Mellon*, 65 A.3d at 551 (in interpreting limited liability company agreement, extrinsic evidence "yield[s] information about the views and position of only one side of the dispute," and is therefore "unhelpful" in deciphering the contract's meaning); *Kaiser Aluminum Corp. Matheson*, 681 A.2d 392, 397 (Del. 1996) (consideration of extrinsic evidence to discern meaning of certificate of designation was inappropriate).

At best, the evidence that Goldman invoked its discretion when providing legal fees to some of its former employees demonstrates the sincerity of Goldman's subjective belief that it is not required to indemnify and advance fees to vice presidents under the By-Laws. This evidence says nothing at all about Aleynikov's reasonable expectation that he would receive advancement and indemnification when he joined Goldman. Neither the majority nor Goldman has suggested that Aleynikov knew, when he began working for Goldman, that Goldman believed it had the discretion to provide attorney's fees to vice presidents.

The same goes for the evidence that Goldman appointed its officers by formal resolution. There is no evidence that Aleynikov knew of these internal documents or regulatory filings when he joined the firm. Nor, I assume, is the majority suggesting that Aleynikov had a duty to scour

10

Goldman's regulatory filings to understand the scope of his benefits.

Both categories of evidence, then, speak only to Goldman's views about what it means to be an officer in its organization. Neither category speaks to what *both* sides' expectations were when entering into the contract. Thus, the evidence is "unhelpful" in divining the meaning of the advancement provision of the By-Laws. *See Bank of N.Y. Mellon*, 65 A.3d at 551. Worse, by allowing the finder of fact to consider evidence of Goldman's subjective belief about the meaning of its poorly drafted advancement provision, we privilege Goldman's unilateral view about what its By-Laws mean over the reasonable expectations of its employee. As I explain above, this contravenes Delaware public policy, which resolutely protects the reasonable expectations of persons interacting with Delaware corporations. *Stockman*, 2009 WL 2096213, at *5.

The majority's rationale for using this evidence is that the majority is "left in a bind" after declining to apply *contra proferentem*. Maj. Op. at 23. To be sure, declining to use *contra proferentem* where a contract is unilaterally drafted leaves us with no satisfactory mechanism to determine the meaning of the governing agreement. That is why we should apply Delaware's rule of interpretation to construe ambiguous provision of the By-Laws against Goldman.

V.

In sum, I would construe the advancement provision of the By-Laws against Goldman. The distinction drawn by the majority not only lacks any basis in Delaware law, it also

11

lacks any clear policy rationale. In fact, Delaware public policy would be benefited by construing the advancement provision in the By-Laws against Goldman. Moreover, by declining to use *contra proferentem*, the majority has invited the use of improper extrinsic evidence to determining what the parties meant. For these reasons, we should conclude that Aleynikov is an officer under the By-Laws and is entitled to advancement of his legal fees from Goldman.

I therefore respectfully dissent.