PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 15-2833

———————

IN RE: NET PAY SOLUTIONS, INC.,
d/b/a NET PAY PAYROLL SERVICES,

Debtor

MARKIAN R. SLOBODIAN,

Appellant

v.

UNITED STATES OF AMERICA INTERNAL REVENUE
SERVICE

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:13-cv-02677)
District Judge: Honorable Christopher C. Conner

———————

Argued March 2, 2016

Before: SMITH and HARDIMAN, *Circuit Judges*.*

(Filed: May 10, 2016)

———————

* The Honorable Dolores K. Sloviter assumed inactive status on April 4, 2016, after the argument and conference in this case, but before filing of the opinion. This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and Third Circuit I.O.P. Chapter 12.

Markian R. Slobodian (Argued)
801 North Second Street
Harrisburg, PA 17108
    *Attorney for Appellant*

Ivan C. Dale (Argued)
Michael J. Haungs
U.S. Department of Justice
Tax Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20044
    *Attorneys for Appellee*

Ari D. Kunofsky, Esq.
United States Department of Justice
Tax Division
P.O. Box 227
Ben Franklin Station
Washington, DC 20044
    *Attorney for Appellee*

_____

OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

Markian Slobodian, in his capacity as trustee of debtor Net Pay Services, Inc., appeals the District Court's summary judgment in favor of the Internal Revenue Service. The District Court denied Slobodian's motion to avoid five alleged preferential transfers under 11 U.S.C. § 547(b) of the Bankruptcy Code. The District Court held that four of the five payments were not avoidable because of their minimal value. And although the fifth payment was sufficiently large to constitute a preference, it was not avoidable because the funds were not property of Net Pay's estate. For the reasons that follow, we will affirm.

I

The facts of this case are straightforward. Before it filed for protection under Chapter 7 of the Bankruptcy Code,

Net Pay managed its clients' payrolls and handled their employment taxes pursuant to a form contract called a "Payroll Services Agreement," which required clients to provide their employee payroll information so Net Pay could determine the taxes and wages they owed. The Agreement gave clients the option of authorizing Net Pay to transfer funds from their bank accounts into Net Pay's account and to remit those funds to the clients' employees, the IRS, and other taxing authorities. The Agreement also established an independent contractor relationship between Net Pay and its clients, disclaiming "any relationship of employment, agency, joint venture, partnership, or any other fiduciary relationship of any kind." App. 189.

At issue in this appeal are five transfers Net Pay made on behalf of its clients to the Internal Revenue Service on May 5, 2011—almost three months before it filed its Chapter 7 petition. These transfers included: (1) $32,297 on behalf of Altus Capital Partners, Inc.; (2) $5,338 on behalf of HealthCare Systems Connections, Inc.; (3) $1,143 on behalf of Project Services, LLC; (4) $352.84 for an unknown client; and (5) $281.13 for another unknown client. The day after these transfers were made, Net Pay informed its clients that it was "ceasing business operations including all payroll processing." App. 267.

As trustee for Net Pay, Slobodian sought to recover the monies represented by these five payments, arguing that they were avoidable preferential transfers.[1] Slobodian and the IRS

---

[1] The Bankruptcy Code allows trustees to "avoid any transfer of an interest of the debtor in property (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made . . . on or within 90 days before the date of the filing of the petition . . . (5) that enables such creditor to receive more than such creditor would receive" in the debtor's bankruptcy proceedings. 11 U.S.C. § 547(b).

filed cross-motions for summary judgment. The District Court granted the IRS judgment as a matter of law.[2]

The District Court concluded that four of the five transfers were not subject to recovery as preference payments because they were less than the minimum amount established by law ($5,850). 11 U.S.C. § 547(c)(9) (2013). Recognizing that four of the payments were beneath that threshold, the Trustee argued that because the payments exceeded $5,850 in the aggregate, the statutory threshold did not apply. The District Court disagreed, reasoning that distinct transfers may be aggregated for purposes of defeating the threshold only if they are "'transactionally related' to the same debt." *Slobodian v. U.S. ex rel. Comm'r*, 533 B.R. 126, 132–133 (M.D. Pa. 2015). Because the payments of $5,338, $1,143, $353, and $281 were "separate and unrelated transactions in satisfaction of independent antecedent debts" to different creditors, the Court held that they could not be aggregated to satisfy the statutory minimum. *Id.* at 133.

As for the $32,297 payment Net Pay made on behalf of Altus, which plainly exceeded the statutory minimum, the question remained whether it was a "transfer of an *interest of the debtor* in property." 11 U.S.C. § 547(b) (emphasis added). To evaluate that question, the District Court noted that section 7501(a) of the Internal Revenue Code creates a special statutory trust in favor of the United States for taxes withheld from employee paychecks (otherwise known as "trust fund" taxes). Informed by the Supreme Court's opinion interpreting that provision in *Begier v. Commissioner*, 496 U.S. 53 (1990), the District Court held that Net Pay lacked an interest in the transferred funds because they were held in trust under § 7501(a) at the moment they were withheld.

Notwithstanding this evidence, the Trustee emphasized that $6,527.90 of the Altus payment was designated for employer, *non-trust-fund* tax obligations unaffected by § 7501(a). The District Court saw the evidence differently, finding that the payroll summary offered by Net Pay in support of this assertion failed to "identify what portion of

---

[2] The District Court had withdrawn the reference from the bankruptcy court pursuant to 28 U.S.C. § 157(d).

Altus's non-trust fund and trust fund tax obligations were *outstanding* at the time." *Id.* at 137 (emphasis added). Because there was unrefuted evidence that the IRS applied the entire $32,297 toward Altus's trust fund tax obligations, the Court held that the payment was not avoidable as a preference.

This timely appeal followed.[3]

## II

We begin with the Trustee's argument that the four smaller value transfers may be aggregated to exceed the Bankruptcy Code's minimum threshold for the avoidance of preferential transfers.[4] We have not had occasion to examine this provision, which states that the "trustee may not avoid . . . a transfer . . . if, in a case filed by a debtor whose debts are not primarily consumer debts, the aggregate value of all

---

[3] The District Court had jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's summary judgment de novo, applying the same standard as the District Court. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Aleynikov v. Goldman Sachs Grp.*, 765 F.3d 350, 358 (3d Cir. 2014).

[4] Assuming the Government's interpretation of the § 7501(a) trust provision is correct, it would not affect the four smaller transfers, which related to non-trust-fund taxes not covered by § 7501(a). On the other hand, if Net Pay's arrangements with its clients created a trust relationship under state or federal law, Net Pay would not have an interest in any of the property transferred to the IRS. *See infra* at 19–21 n.13.

property that constitutes or is affected by such transfer is less than $5,850."[5] 11 U.S.C. § 547(c)(9).

A

Although section 547(c)(9) is less than pellucid, it is clear that the "aggregate value" of "all property" that "constitutes or is affected by" a debtor's "transfer to or for the benefit of a creditor" must be at least $5,850 to be avoidable as a preference. 11 U.S.C. § 547(b)(1), (c)(9). But this leaves unanswered the question whether small-value transfers for the benefit of *different* creditors and based on *distinct* debts can be aggregated and avoided as preferential. Citing an interpretive rule—"the singular includes the plural," 11 U.S.C. § 102(7)—the Trustee reads the Bankruptcy Code to allow the aggregation of *transfers* that individually fall below the threshold, as long as they were all to the same transferee. We reject the Trustee's reading. As we shall explain, when read in context, § 547(c)(9) precludes aggregation of multiple preferential transfers for the benefit of different creditors on distinct debts.

1

A "central policy" of the Bankruptcy Code is "[e]quality of distribution among creditors." *Begier*, 496 U.S. at 58. "According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property." *Id.* The power of bankruptcy trustees to avoid preferential transfers that benefit certain creditors over others is critical to this system. "This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy." *Id.* The fear is that "[i]f preference law fails to preserve absolute equality in

---

[5] This dollar amount has since been increased, but the old amount controls. *See* Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(A) of the Code, 75 Fed. Reg. 8747, 8748 (Feb. 21, 2013); 11 U.S.C. § 104(c). The IRS has the burden of proving the unavoidability of a transfer under § 547(c)(9). *J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.*, 891 F.2d 66, 71 (3d Cir. 1989); 11 U.S.C. § 547(g).

6

liquidation, those creditors who are aware of this failure will compete for position during insolvency rather than cooperating fully in an attempt to maximize the value of the firm." Note, *Preferential Transfers and the Value of the Insolvent Firm*, 87 Yale L.J. 1449, 1455 (1978); *see also In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 219 (3d Cir. 1994) ("[T]he preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor.").

The Bankruptcy Code includes certain exceptions to the general preference rules. For example, a trustee may not avoid a transfer made "in the ordinary course of business," 11 U.S.C. § 547(c)(2), "because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991) (internal quotation marks omitted). Indeed, it furthers bankruptcy policies by "encourage[ing] creditors to continue dealing with distressed debtors on normal business terms" and "promot[ing] equality of distribution by ensuring that creditors are treated equitably." *In re Pillowtex Corp.*, 427 B.R. 301, 306 (Bankr. D. Del. 2010) (citing *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 219 (3d Cir. 1994)).

The § 547(c)(9) minimum threshold is a relatively new addition to the Code.[6] *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109–8, 119 Stat. 23 (April 20, 2005). This provision was intended to benefit creditors who had to decide whether small-value preference actions were worth defending. *See* Kevin C. Driscoll Jr., *Bankruptcy 2005: New Landscape for Preference Proceedings*, Am. Bankr. Inst. J., June 2005, at 1, 56. Given

---

[6] A longer standing, nearly identical provision set a lower threshold for consumer cases: "The trustee may not avoid . . . a transfer . . . if, in a case filed by an individual debtor whose debts are primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $600." 11 U.S.C. § 547(c)(8).

that "spending $10,000 in legal fees to defeat a $5,000 preference is a Pyrrhic victory," many "defendants in these smaller preferences chose to settle otherwise defendable claims." *Id.* Accordingly, as one court has observed, the essential function of the minimum threshold is to "discourage[] litigation over relatively insignificant transfer amounts" in order to "promote commercial and judicial efficiency, not only by reducing litigation over nominal amounts, but also by preventing creditors with smaller claims from waiving otherwise meritorious defenses simply because the costs associated with defending against trustees' avoidance actions exceed any anticipated benefits." *In re Bay Area Glass, Inc.*, 454 B.R. 86, 90 (B.A.P. 9th Cir. 2011).

2

In view of this statutory scheme, the Trustee's argument makes little sense. An individual creditor's ability to invoke the minimum threshold as a defense would depend not only upon whether the transfer from which it benefitted was less than $5,850, but also on whether the debtor had made *any* transfers (large or small) for the benefit of *other creditors*, and whether all transfers taken together exceed the statutory threshold. As the following hypothetical demonstrates, this cannot be the law.

Assume a debtor has 1,000 creditors to whom it paid $5,000 each during the preference period. If we accepted the Trustee's argument, the debtor's estate would be able to recover this $5,000,000 and none of those creditors would be able to invoke the $5,850 minimum threshold as a defense. This would render § 547(c)(9) ineffective. In fact, the statute's only effect would be to apply in the very few bankruptcies where creditors were paid, in the aggregate, less than $5,850 during the preference period. Because this construction would render the minimum threshold an "empty promise,"[7] *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015), we must reject it.

---

[7] The Trustee's suggestion at oral argument that aggregation should be liberally permitted when a number of transfers for the benefit of independent creditors are made to a *single transferee* might limit these concerns to some extent,

8

The Supreme Court has recognized that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (internal citation omitted). Section 547(c)(9) is such a provision. And close inspection of the statutory scheme reveals that an interpretation of the minimum threshold that fails to distinguish between creditors is incompatible with the preference regime.

B

Unlike the Trustee's argument, the District Court's reading of § 547(c)(9) is faithful both to the text of the statute and the law as a whole. To reiterate, the defense provides that a debtor's "transfer to or for the benefit of a creditor" may not be avoided if the "aggregate value" of "all property" that "constitutes or is affected by such transfer" is "less than $5,850." 11 U.S.C. § 547(b)(1), (c)(9). In context, this language requires that creditors be considered independently. Hence, a creditor who has received the benefit of a prepetition transfer less than that threshold may invoke the defense regardless of what other creditors have received. This comports with section 547's text, which speaks to transfers "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1). It also accords with the interpretation reached by a number of bankruptcy courts. *See, e.g.*, *In re Pickens*, 2007 WL 1650140, at *4 (Bankr. N.D. Iowa June 4, 2007) ("Trustee cannot aggregate the total transfers of both [creditors] in this action to reach the $5,000 limit. Since the parties agree that [one creditor] received more than $5,000 in payments during the preference period, she is barred from asserting § 547(c)(9) as an affirmative defense as to those payments."); *In re Nelson*, 419 B.R. 338, 341 (Bankr. W.D. Ky. 2009)

---

but it has no basis in the text of the statute, which speaks in terms of debtors and creditors, not of transferees. Net Pay conceded as much. *See* Net Pay Reply Br. 4 ("The statute does not focus on the identity of the recipient of the transfer.").

9

("[Creditors] are to be considered individually when applying § 547(c)(8).").

The text and context of § 547(c)(9) also demonstrate that the minimum threshold contemplates a transfer-by-transfer analysis. In this respect, the Trustee is wrong to describe the threshold as internally inconsistent. *See* Net Pay Br. 15 ("The language of [§ 547(c)(9)] is internally contradictory or at best ambiguous because the term 'aggregate' implies a summation of various transfers, while the language 'such transfer' implies the defense should be applied on a payment by payment basis.") (quoting *In re Carter*, 506 B.R. 83, 87 (Bankr. D. Ariz. 2014)). In fact, the provision anticipates that a single transfer might be composed of more than one type of property and instructs that "*all* property that *constitutes or is affected by*" that transfer should be aggregated for purposes of determining whether the threshold is met. 11 U.S.C. § 547(c)(9) (emphases added).[8]

This does not mean, of course, that courts must apply the minimum threshold in a mindless way that would permit wily debtors to thwart the law by structuring multiple transfers in amounts less than the threshold. Although § 547(c)(9) envisions creditor-by-creditor and transfer-by-transfer analyses, both the statutory scheme and the rule that the singular includes the plural require that ostensibly distinct transfers may nevertheless be aggregated if they are, in effect, a single transfer on account of the same debt. *See* 4 Norton Bankr. L. & Prac. 3d § 66:33 ("Courts look behind the form of multiple transfers to avoid [strategic separation of transfers on the same underlying obligation]. When a number of less

---

[8] One bankruptcy court reached this conclusion in a preference action against a debtor's prepetition transfer of both cash and a security interest in property to each of two different creditors, wherein the cash and security interest independently fell below the minimum threshold but collectively exceeded it. *See Pickens*, 2007 WL 1650140, at *3–4. There, the court held that the trustee could not "aggregate the total transfers of both [creditors]" and that the property transferred to each creditor—cash and the security interest—could only be aggregated with respect to each creditor if they were "transactionally related." *Id.* at *5.

than [$5,850] transfers occur between two parties, it is appropriate to treat the transfers as one transaction if they are, in fact, conducted pursuant to a single, common plan."); Commercial Bankruptcy Litigation § 11:20 n.3 ("Multiple transfers to a single creditor may be aggregated where the underlying facts and circumstances indicate the transfers *were part of a common plan.*") (emphasis added); Andrea Coles-Bjerre, *Bankruptcy Theory and the Acceptance of Ambiguity*, 80 Am. Bankr. L.J. 327, 354 n.85 (2006) (recognizing that "aggregation within a transfer—whatever those bounds may be—is different from aggregation across transfers").

In sum, the Trustee's reliance on § 102(7) ("the singular includes the plural") cannot bear the weight he has placed upon it. As the District Court observed, if that provision had the effect of allowing the debtor to aggregate any and all transfers, "inclusion of the word 'aggregate' in the provision would be entirely superfluous." *Slobodian*, 533 B.R. at 133; *see also Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("It is the cardinal principle of statutory construction . . . to give effect, if possible, to every clause and word of a statute.") (internal quotation marks omitted); *Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining that "one of the most basic interpretive canons" is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal quotation marks omitted). As the foregoing explanation demonstrates, the fact that the singular includes the plural simply means that (1) a creditor may invoke the defense for multiple, independently qualifying transfers (*i.e.*, it's not a "one-and-done" defense) and (2) a party may defeat the defense where the challenged transfers are strategically divided yet transactionally related.[9]

---

[9] The authorities relied on by the Trustee are consistent with this approach. Although each decision invokes § 102(7) in allowing aggregation of multiple preferences, the critical distinction is that the challenged payments in each case were made for the benefit of a *single* creditor on account of a *single* debt. *See In re Hailes*, 77 F.3d 873, 874–75 (5th Cir. 1996) (several transfers to a single creditor on account of a single judgment debt); *In re Carter*, 506 B.R. at 85–86 (multiple

11

\*　　\*　　\*

In light of our interpretation of § 547(c)(9), we hold that Net Pay's four small-value transfers may not be aggregated to exceed the minimum threshold for avoidable preferences. Each payment involved a different creditor (*i.e.*, a different Net Pay client), unrelated antecedent debts, and distinct tax liabilities. Accordingly, the District Court did not err when it held that the payments of $5,338, $1,143, $353, and $281 to the IRS are not avoidable preferences.

## III

We now consider Net Pay's $32,297 payment to the IRS on behalf of Altus, which obviously is not subject to the minimum threshold defense of § 547(c)(9). The question presented with respect to this payment is whether it was "an interest of the debtor in property." 11 U.S.C. § 547(b). The District Court held that because Altus's funds were held by Net Pay in a special statutory trust pursuant to 26 U.S.C. § 7501(a), Net Pay had no interest in them. We agree.

## A

The Internal Revenue Code provides that "[w]henever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). This "any person"/"any other person" language is a vague way of saying that the provision

---

payments but just one creditor and one debt); *In re Transcon. Refrigerated Lines, Inc.*, 438 B.R. 520, 521 (Bankr. M.D. Pa. 2010) (permitting aggregation of three separate transfers to a single creditor in satisfaction of a single debt); *In re Bunner*, 145 B.R. 266, 267 (Bankr. C.D. Ill. 1992) (same, with respect to separate garnishment payments); *In re Alarcon*, 186 B.R. 135, 137 (Bankr. D.N.M. 1995) (same); *see also Pickens*, 2007 WL 1650140, at \*4 ("Cases arising under the consumer small preference exception are not helpful as they, almost without exception, consider multiple small payments to a *single creditor* on a *single debt*, with the majority of the cases considering wage garnishment.") (emphases added).

12

applies to federal taxes that Congress requires employers to withhold from their employees' paychecks, otherwise known as "trust fund taxes." *Begier*, 496 U.S. at 54; *In re Calabrese*, 689 F.3d 312, 316 (3d Cir. 2012).

The Supreme Court interpreted § 7501(a) in *Begier*, which involved an airline that declared bankruptcy after paying certain withholding taxes to the IRS. 496 U.S. at 55–56. The airline had commingled some of the trust fund taxes that it withheld from its employees with money in its general operating account, and then transferred funds to the IRS in satisfaction of its trust fund tax obligations from both the commingled general account and a segregated tax-fund-only account. *Id.* When the airline tried to avoid all these payments as preferential transfers, the IRS countered that the airline never had an interest in the funds because of § 7501(a). *Id.* at 56–57.

The Court began its analysis by defining "interest of the debtor in property." Noting that "the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate," the Court reasoned that "'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Id.* at 58. The Court then turned to the Code's definition of "property of the estate," which includes "all legal or equitable interests of the debtor in property as of the commencement of the case" but excludes property in which the debtor holds "only legal title and not an equitable interest." *Id.* at 59 (quoting 11 U.S.C. § 541(a), (d)). Because a debtor "does not own an equitable interest in property he holds in trust for another," the Court concluded that such property is not subject to § 547(b). *Id.*

Having established the legal framework, the Court articulated a two-pronged inquiry for deciding whether a prepetition transfer from a debtor to the IRS is unavoidable under § 7501(a): (1) whether a special statutory trust was created with respect to a certain dollar amount in the first place; and (2) if so, whether the assets used to pay the IRS were assets belonging to that trust. *Id.* at 57–67. On the first question, the airline argued that even though § 7501(a)

13

creates a statutory trust extending to "the amount of tax . . . collected or withheld," a trust fund tax is not "collected or withheld" until specific funds are either sent to the IRS with the relevant return or placed in a segregated fund. *Id.* at 60. The Supreme Court disagreed, holding that the trust was created at the moment the relevant taxes were withheld, and that "[w]ithholding . . . occurs at the time of payment to the employee of his net wages." *Id.* at 60–61. It followed that the airline created a special trust for the benefit of the United States once it withheld the funds from its employees' paychecks. *Id.* at 60–62.

The Court then considered the second prong of the trust inquiry: whether the assets the airline used to pay the IRS belonged to that trust. *Id* at 57–67. Absent statutory guidance on this tracing question, the Court first considered the common law. *Id.* at 62. But the Court found that unhelpful because, "[u]nder common law principles, a trust is created in *property*; a trust therefore does not come into existence until the settler identifies an ascertainable interest in property to be the trust res." *Id.* (emphasis added). The statute's approach is "radically different." *Id.* It provides that "the *amount* of [trust-fund] tax . . . collected or withheld shall be held to be a special fund in trust for the United States." *Id.* (quoting § 7501(a)) (alteration in original). Hence, rather than envisioning a particular *property* to be the trust res, § 7501(a) "creates a trust in an abstract 'amount'—a dollar *figure* not tied to any particular assets—rather than in the actual dollars withheld."[10] *Id.* It therefore made no sense for the Court to apply common law tracing rules to the particular dollars

---

[10] Some have called into question the propriety of using trust law when applying § 7501(a). *See In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. 135, 156 (Bankr. D. Del. 2010) ("Not only does the '§ 7501 trust' at issue in *Begier* not fit 'the common law paradigm,' it is not even a 'trust' as that term is used under the law. You simply cannot have a trust without trust property. The 'amount of tax' is not property. Rather, it is the *value* of the property."); *Begier*, 496 U.S. at 68 (Scalia, J., concurring) ("One 'traces' a fund only after one identifies the fund in the first place. The problem here is not 'following the res' of the tax trust, but identifying the res to begin with.").

withheld and the particular dollars paid to the IRS. *Id.* at 62–63.

Having rejected the strict tracing rule of the common law, the Court was faced with a dilemma. "Congress," the Court surmised, "expected that the IRS would have to show *some* connection between the § 7501 trust and the assets sought to be applied to a debtor's trust-fund tax obligations." *Id.* at 65–66. The question was *how much* of a connection? Relying on legislative history as "persuasive evidence of Congressional intent,"[11] the Court held that courts should allow the IRS to apply "reasonable assumptions" to govern the tracing of withheld funds. *Id.* at 64–66 & n.5. One such assumption identified by the Court is "that any voluntary prepetition payment of trust-fund taxes out of the debtor's assets is not a transfer of the debtor's property." *Id.* at 67. Hence, "the debtor's act of voluntarily paying its trust-fund tax obligation . . . is alone sufficient to establish the required nexus between the 'amount' held in trust and the funds paid." *Id.* at 66–67. In other words, "the bankruptcy trustee could not avoid *any* voluntary prepetition payment of trust-fund taxes, regardless of the source of the funds." *Id.* at 66. Because the airline had voluntarily paid its trust fund tax obligation out of its assets, the Court held that the transferred amount had merely been held in trust by the airline and thus could not be avoided as a preference. *Id.* at 67.

B

Our rather detailed exposition on *Begier* is necessary here because there is only one meaningful difference between that case and this appeal: here, the debtor is an *intermediary* that withheld and paid taxes on behalf of its client-employers.

---

[11] The Court likely would have arrived at the same conclusion even without its reliance on legislative history. *See Begier*, 496 U.S. at 70 (Scalia, J., concurring) ("If the Court had applied to the text of the statute the standard tools of legal reasoning, instead of scouring the legislative history for some scrap that is on point (and therefore *ipso facto* relevant, no matter how unlikely a source of congressional reliance or attention), it would have reached the same result it does today.").

According to the Trustee, this distinction makes all the difference because the "obvious meaning of the statute is that in order for a trust to be created, a person who is required to collect the tax must actually withhold the tax." Net Pay Br. 11. Because Net Pay's clients, not Net Pay itself, were required to withhold the taxes at issue, the Trustee suggests that those withholdings escape the statute. *Id.* at 11–12. We are not persuaded.

Section 7501(a) provides that "[w]henever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). Net Pay's clients indisputably were persons "required to collect or withhold any internal revenue tax from [their employees] and to pay over such tax to the United States." 26 U.S.C. § 7501(a). And the provision does not say that clients themselves must be the only ones involved in the withholding process in order for trust principles to be implicated. It simply says that whenever an employer is required to withhold employee taxes, the "amount of tax" that is "so collected or withheld shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). Nothing there suggests that an employer may avoid the fact that an amount required by law is being held in trust for the United States merely by outsourcing payroll processing to a third party. In fact, reading the statute that way would contravene *Begier*, which instructs that "[n]othing in § 7501 indicates . . . that Congress wanted the IRS to be protected only insofar as dictated by the debtor's whim." 496 U.S. at 61. In effect, Net Pay's construction amends the statute to read: Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld *by the person so required, and only if by that person alone,* shall be held to be a special fund in trust for the United States. Such a limit is present neither in the statute's text nor in the Supreme Court's opinion in *Begier*.

The Trustee cites various cases in support of its interpretation, but none carry the day. He quotes seemingly helpful language from *In re Warnaco Group, Inc.*, but omits

16

crucial details. *Warnaco* involved a staffing company (Pro Staff) that provided the debtor with employees in exchange for fees and reimbursements. 2006 WL 278152, at *1 (S.D.N.Y. Feb. 2, 2006). Rejecting Pro Staff's argument that certain payments from the debtor to Pro Staff represented employees' withheld taxes and were not avoidable, the District Court distinguished *Begier* because "[i]n that case, the employer, and no one else, withheld taxes." *Id.* at 5. Although this snippet appears to support the Trustee's argument that third-party involvement vitiates trust status, the real reason the situation was distinguishable from *Begier* was that the transfers the debtor sought to avoid were not payments of withholding taxes, but rather, *reimbursements* to Pro Staff "for monies *already paid by Pro Staff* to employees for salaries, taxing authorities and insurance premiums." *Id.* at 5 (emphasis added). As the court explained, "none of the amount paid to Pro Staff was specifically and directly reserved for withholding taxes. Rather, Pro Staff could do with that money as it saw fit." *Id.* Thus, the arrangement in *Warnaco* differed markedly from the one at issue in this case, where the amount paid to the IRS *was* reserved by the employer (Altus) for withholding taxes.

The bankruptcy court's decision in *In re U.S. Wireless Corp.* is similarly inapposite. Net Pay cites that case for the proposition that trust status is dependent upon the identity of the person who does the withholding. But *U.S. Wireless* says no such thing. Rather, it merely held that no statutory trust was created when the debtor-company forgot to withhold taxes from an employee's paycheck and then simply paid the taxes itself. 333 B.R. 688, 695 (Bankr. D. Del. 2005). Because "the statute's own terms limit the trust to the amount so 'collected or withheld,'" the bankruptcy court reasoned, the fact that the debtor "never collected or withheld any money from [the employee]" meant that "no trust could have been created" and that "[t]he property belonged to the [debtor] and is, therefore, potentially recoverable." *Id.* Here, by contrast, we are dealing with amounts that were properly withheld and paid over to the IRS.[12]

---

[12] One bankruptcy court decision *does* support Net Pay's interpretation. *See In re FirstPay, Inc.*, 2012 WL

17

\*　　\*　　\*

Section 7501(a)'s language is broad enough to cover the facts of this case. It makes no difference that Net Pay's customers used the company as an intermediary to withhold and pay its employees' taxes. The Altus payment represented an amount it was "required to . . . withhold," 26 U.S.C. § 7501(a), and that was so withheld pursuant to the contract between Altus and Net Pay. The Tax Code thus deems the amount to have been "held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). And because the amount was paid out of Altus's assets, the traceability nexus is met. *See Begier*, 496 U.S. at 66–67. Accordingly, the District Court did not err when it held that Net Pay lacked any interest in the property and may not avoid the transfer.

C

The Trustee argues that even if the statutory trust provision applies, $6,527.90 of the Altus payment may be avoided as a preference because it was marked for employer, *non-trust-fund* tax obligations. An internal payroll summary indicates that Altus had generated $25,769.90 in trust fund taxes and $6,527.90 in non-trust-fund taxes during the period covered by the summary: April 1–May 31, 2011. Accordingly, the Trustee argues that it's unclear that the entire $32,297 sum was applied to Altus's trust fund tax obligations.

---

3778952 (Bankr. D. Md. Aug. 30, 2012). But that decision—which also involved a payroll-company debtor—is virtually devoid of analysis. *See id.* at \*5 ("In the present case, in contrast to *Begier*, FirstPay was not holding the subject funds in a statutory trust for the IRS pursuant to 26 U.S.C. § 7501, *as the funds were not collected or withheld by FirstPay to meet its own trust-fund tax obligations*.") (emphasis added). Rather than correcting this faulty and conclusory reasoning, the Fourth Circuit simply held that the relevant funds were held in a *state-law* trust and did not consider whether the federal statutory trust provision applied. *See In re FirstPay, Inc.*, 773 F.3d 583, 592–94 (4th Cir. 2014).

18

The District Court did not err in holding that there is no genuine issue of material fact as to whether the entire Altus payment was applied to Altus's trust fund obligations. The record shows that on April 28, 2011, Net Pay withdrew $114,335 from Altus's bank account, of which $32,297 was designated for payment to the IRS on or before May 6, 2011. Both trust-fund and non-trust-fund portions of federal employment taxes were generated throughout the quarter as Altus's employees earned wages. *See Donelan Phelps & Co. v. United States*, 876 F.2d 1373, 1374–75 (8th Cir. 1989); *Calabrese*, 689 F.3d at 316. Critically, the moment *when* taxes accrue is irrelevant to which portion of the tax liability is actually paid. Consistent with standard IRS practice, non-trust-fund taxes are deemed to be paid first, even though they may accrue later in that quarter. *In re Ribs-R-Us, Inc.*, 828 F.2d 199, 201 (3d Cir. 1997); *see also Westerman v. United States*, 718 F.3d 743, 749 (8th Cir. 2013). There was unrebutted testimony on the record to this effect. And while the document upon which the Trustee relies does not identify what portion of Altus's non-trust-fund and trust fund tax obligations were outstanding at the time, the record does. In the relevant period, Altus owed $164,504 in employment taxes. Of that amount, $137,521 consisted of trust fund taxes, and $26,983 consisted of non-trust-fund taxes. By the time the IRS received the $32,297 transfer from Net Pay, Altus had made deposits exceeding its $26,983 non-trust-fund liability for the second quarter of 2011. Consequently, the $32,297 payment was applied to Altus's trust fund tax liability.

Stated differently, Altus was required to withhold $137,521 from its employees' wages during the relevant period, and that "amount of tax so collected or withheld [was] held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). This is further demonstrated by the consequence of Net Pay's logic: were some portion of that amount to revert to Net Pay's estate, Altus would be on the hook for that exact amount in unpaid *trust fund* taxes. Because what matters for purposes of the statutory trust is the overall "amount" withheld, and because there is unrebutted evidence that the full $32,297 was withheld by Altus and paid over to the IRS, the District Court correctly held that there is no genuine issue of material fact as to whether the entire

19

Altus payment was applied to Altus's trust fund obligations and was held in trust by Net Pay for the United States.[13]

---

[13] Although the foregoing resolves this appeal on the same grounds as the District Court, we note that, under Pennsylvania state law, Net Pay would not be entitled to the money at issue even if its interpretation of the minimum threshold and the federal trust provision were correct. Absent federal preemption, we look to state law to determine the nature of a debtor's interest in property. *Butner v. United States,* 440 U.S. 48, 54–55 (1979) ("Property interests are created and defined by state law. . . . [u]nless some federal interest requires a different result."). Net Pay's agreements with its customers designate Pennsylvania law as the governing law. Assuming *arguendo* that federal law is silent and that Pennsylvania law does not conflict with federal interests, we would conclude that the funds were held in a resulting trust (*i.e.*, one implied by the circumstances) under Pennsylvania law. The Government has produced more than sufficient evidence "showing circumstances which raise an inference that in making the conveyance to [Net Pay], there was no intention [by Net Pay's customers] to give [Net Pay] the beneficial interest in the property." *Mooney v. Greater New Castle Dev. Corp.*, 510 A.2d 344, 346 (Pa. 1986). *See also In re Vosburgh's Estate,* 123 A. 813, 815 (Pa. 1924) ("[E]very person who receives money to be paid to another or to be applied to a particular purpose is a trustee, if so applied, as well as when not so applied."). Were it otherwise, Net Pay would not have bothered to contract for a set-off right and security interest to secure payment of service fees since, as it claims, all the money it received from its customers would have been its property anyway. And without an equitable interest in the money withdrawn from each client's account, § 547(b) does not apply. *See* 11 U.S.C. § 547(b) (requiring the debtor to have an interest in the property in order to avoid a transfer); *Begier*, 496 U.S. at 59 (observing that "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate'").

Moreover, even if we were to determine that Pennsylvania law conflicts with an important federal interest such that federal law governs the "interest of the debtor in

IV

Our legal analysis is supported by common sense. It is hard to fathom that Net Pay's clients intended anything other than to "transfer *only* bare legal title" to Net Pay with respect to the funds meant for payment to the IRS. *Galford v. Burkhouse,* 478 A.2d 1328, 1334 (Pa. Super. Ct. 1984). Of course, "[w]hether the money is held in trust must be determined . . . not merely by reliance on common sense, but also by application of traditional legal doctrines." *In re Penn Cent. Transp. Co.*, 486 F.2d 519, 524 (3d Cir. 1973). Here, as we have explained, those legal doctrines cohere with common sense.

Net Pay is not entitled to recoup the money it transferred to the IRS on behalf of its clients. Four of its transfers may not be challenged as preferences because they did not meet the statutory threshold of 11 U.S.C. § 547(c)(9), and the Altus payment may not be avoided because Net Pay lacked an equitable interest in the property by operation of 26 U.S.C. § 7501(a). For these reasons, we will affirm the judgment of the District Court.

---

property" inquiry, we would conclude that Net Pay held the funds in trust pursuant to federal common law. *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1056 (3d Cir. 1993) ("Federal common law imposes a trust when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient."); *see also In re Penn Central Transp. Co.*, 486 F.2d 519, 523–27 (3d Cir. 1973) (en banc).

As for the tracing requirement—which in either case calls for application of federal rather than state tracing rules, *see City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95–96 (3d Cir. 1994)—we agree with the Fourth Circuit that "the law will presume that any funds received, held, and ultimately transferred by a trustee in accordance with the trust purpose are indeed trust funds." *FirstPay*, 773 F.3d at 595. As stated, the Trustee has not rebutted this presumption; the funds paid to the IRS are clearly traceable to the funds deposited into Net Pay's account just days before the transfers at issue.